532 April 9, 2025 No. 312

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

LUIS HERNANDEZ-SANCHEZ,
*Defendant-Appellant.*

Washington County Circuit Court
C152335CR; A179322

Andrew Erwin, Judge.

Argued and submitted June 17, 2024.

Marc D. Brown, Deputy Public Defender, argued the cause for appellant. Also on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Erica L. Herb, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Aoyagi, Presiding Judge, Tookey, Judge, and Joyce, Judge.*

TOOKEY, J.

Remanded for resentencing; otherwise affirmed.

_____
* Tookey, J., *vice* Jacquot, J.

**TOOKEY, J.**

Defendant appeals a judgment of conviction for two counts of first-degree sodomy (Counts 1 and 2), two counts of first-degree rape (Counts 3 and 4), three counts of first-degree unlawful sexual penetration (Counts 5, 8, and 9), and six counts of first-degree sexual abuse (Counts 6, 7, 10, 11, 13 and 14).[1] Defendant raises three assignments of error: (1) that the trial court "erred when it denied defendant's request for a new attorney"; (2) that the trial court "erred in instructing the jury that, 'Generally, the testimony of any witness whom you believe is sufficient to prove any fact in dispute'"; and (3) that the trial court "erred when it imposed a sentence on remand greater than the sentence imposed originally."

We reject defendant's first assignment of error for the reasons below. We reject defendant's second assignment of error—challenging the trial court's jury instruction concerning witness testimony—without discussion.[2] Defendant's third assignment of error, however, is well taken. Consequently, we remand for resentencing.

## I.   BACKGROUND

This is the second time this case has come before us. The first time, defendant appealed a judgment of conviction sentencing him to 300 months' incarceration for the above referenced offenses (Counts 1 through 11, and Counts 13 and 14) entered after a jury returned nonunanimous guilty verdicts on all of the counts except Count 6. *State v. Hernandez-Sanchez*, 310 Or App 231, 486 P3d 806 (2021). On Count 6, the jury had reached a unanimous guilty verdict. *Id.* At the trial underlying that appeal, defendant had been represented by court-appointed counsel from Metropolitan Public Defender (MPD).

---

[1] Additionally, defendant was charged with one count of coercion (Count 12). That count was dismissed.

[2] As noted later in this opinion, this is the second time this case has come before us. As defendant's briefing acknowledges, the first time this case was before us, we "rejected without discussion the arguments presented in [defendant's second] assignment of error." *See State v. Hernandez-Sanchez*, 310 Or App 231, 233, 486 P3d 806 (2021) (rejecting second assignment of error "without written discussion"). Defendant raises the assignment of error again in this appeal so as to "preserve it for further appellate review."

In defendant's first appeal, we reversed defendant's convictions, with the exception of Count 6. *Id.* As to Count 6, we remanded for resentencing. *Id.*

## A. *Defendant's Motion for New Counsel on Remand*

On remand, the state sought to retry defendant on Counts 1 through 5, Counts 7 through 11, and Counts 13 and 14. During pretrial proceedings, defendant requested court-appointed counsel. He was again appointed counsel from MPD.

Defendant's appointed counsel then moved to withdraw. Along with his motion, he filed an affidavit that provided:

"The basis for my motion to withdraw is that [defendant] is unhappy with the representation provided by MPD during both his first trial and during the time his case has been back [from] appeal. He is aware of the shortage of qualified attorneys and has informed me he would represent himself if need be."

The trial court held a hearing on that motion, during which defense counsel explained that defendant had requested that he file the motion to withdraw. Defense counsel then explained, broadly, the nature of defendant's concerns, while seemingly mindful of his professional obligations with regard to defendant:

"Without violating my confidences and duty to [defendant], I will inform the court that [defendant's] case is back [from] appeal. My office represented him during the first trial setting and he had some qualms about that representation. I believe that those have persisted during this representation to a point that [defendant] has asked both times to withdraw from this case.

"I had explained to [defendant] the situation with criminal defense representation, a crisis going on in the state and particularly involving cases of this magnitude. Knowing that, [defendant] still asked that I file this motion to withdraw, informed me that he would be willing to represent himself, even if there was not another attorney available to represent him. I think that's as much as I'm permitted to provide the court."

The trial court then explained to defendant that he could represent himself, he could represent himself with his counsel from MPD as "advice counsel," or he could hire his own attorney. The court also explained that if it were to appoint a new attorney to represent defendant, it might take "months" due to the shortage of public defenders.

Defendant then stated that he wanted to represent himself, and the trial court began to conduct a waiver-of-counsel colloquy. But, partway through the colloquy, defendant requested time to consider the decision. The trial court stated that it thought that was a "really good idea" and scheduled a hearing for a few days later.

At the subsequent hearing, defendant's counsel explained to the court that defendant wanted "a new attorney even if it takes months," and the trial court denied that request, stating:

> "COURT:   So, [defendant], so far I have not heard anything either in today's hearing or the previous hearing that we had, that would lead me to believe that [defense counsel] is not a competent attorney. You're entitled to a competent attorney. You're entitled to represent yourself. I'm not going to reset your trial.
>
> "Do you want [defense counsel] to represent you or do you want to represent yourself with advice counsel? How do you want to move forward?
>
> "THE DEFENDANT:    *** I want a new attorney.
>
> "THE COURT:   No, you're not getting a new attorney. I just said that."

Thus, the court denied defendant's request for substitute counsel. Defendant proceeded to trial with counsel from MPD.

B.  *Defendant's Second Trial*

As noted, defendant was charged with various sex crimes, including two counts of first-degree sodomy, two counts of first-degree rape, three counts of first-degree unlawful sexual penetration, and five counts of first-degree sexual abuse. Defendant's conduct that gave rise to those charges began when the victim was five years old, while

defendant, who was described at trial as "sort of a step-father" to the victim, was living with victim, her mother, and her grandparents. Defendant's conduct against the victim continued at different times and with different frequency until she was approximately 12 years old.

Defendant's theory of the case during his second trial—notwithstanding that, at time of his second trial, he had been convicted of one count of first-degree sexual abuse against the victim which was affirmed on appeal (Count 6)—was that he did not commit the charged sex crimes against the victim and that she was, in fact, "lying" when she accused defendant. Thus, defense counsel began his opening statement:

"All right. Ladies and gentlemen, [defendant] is innocent. He did not do this. He did not touch [the victim]. He did not rape, sodomize, [or] penetrate his stepdaughter."

In furtherance of his theory of the case, defendant called, among other witnesses, the victim's brother, who testified that he had known the victim for his entire life and his opinion as to the victim's "character for truthfulness" was that she was "untruthful." Defendant also called the victim's mother, who testified that she had known the victim for the victim's entire life and her opinion was that the victim was "not truthful."

The victim also testified during defendant's second trial. She explained that although she had initially disclosed the abuse to her grandmother when she was five, when she was interviewed by CARES after that disclosure was made, she did not repeat the disclosure, because she did not feel it was "safe to do that"; she did not feel like she was "being supported" by her family; and the "vibe" she got from her family was that of "failing."

Additionally, during defendant's second trial, the victim testified as to how the case has impacted her relationship with her family: She explained that she does not have a relationship with her mother, and the case against defendant is "a factor" in that; that her siblings "don't fully know everything or understand it" so they "just blame me for why their dad is gone"; that she does not "get to see" her youngest

brother, who was six at the time of the second trial, because she was not seeing her mother; and that defendant's conduct coming to light had "put a strain" on her relationship with her brothers and her sister. The victim further explained that her grandparents still had defendant's picture on their wall. When asked "who in [her] life" she could turn to, the victim testified that she sees her grandparents "maybe every other month" though her grandmother has dementia and confuses the victim with the victim's mother and the victim's sister.

After hearing the evidence and argument, the jury unanimously convicted defendant of the crimes for which he was on trial—that is, two counts of first-degree sodomy, two counts of first-degree rape, three counts of first-degree unlawful sexual penetration, and five counts of first-degree sexual abuse.

## C.  *Defendant's Sentencing*

Defendant's sentencing took place before a different judge than the judge who had sentenced defendant after his first trial. During defendant's sentencing, the state recognized that defendant was previously sentenced to a total of 300 months' incarceration, and it recommended that the court sentence defendant to no less than that. The state further recommended that the court impose "consecutive time to account for the aggravated nature of this case and the lasting impact we have seen the abuse had on the victim."

The state argued that the trial court was in a "unique position to observe the victim roughly seven years after [defendant's] initial conviction" and that "[t]he evidence at the second trial provided additional information that the victim experienced pressure by her family to recant her initial disclosure," including that she "felt pressure not to say anything as it would potentially tear her family apart." The state also noted the victim's mother's "continued denial of the sexual abuse," which "contribute[d] to the victim's trauma." In particular, the state noted that since the last trial the victim had had to "cut [her mother] out of her life" and that the victim had "lost contact" with her brother "as a result of th[e] charges."

Defendant responded to the state's argument for a greater than 300-month sentence by noting that, although the sentencing was "obviously different than last time," because the case was "six years removed from the last trial," the situation regarding the victim's relationship with her mother and brother were "not things from [defendant's] behavior or him electing to have this second trial."

The trial court ultimately sentenced defendant to 375 months' incarceration.[3] In explaining its reasoning, the court noted, among other points, the emotional harm that defendant's conduct had caused to the victim and what it called defendant's trial "tactic" of "calling [the victim] a liar," which the trial court determined was "deliberately designed to cause incredible difficulties for this victim":

"So, not only I, but also the jury *** overwhelmingly expressed not just *** their belief and support for [the victim], but also how profoundly disturbed they were by how isolated she'd become by all the people that are important in her life and—and utterly cast to the edge and abandoned in just the most graphic way.

"Each and every juror mentioned how horrific that circumstance was for her to come back, to still have to kind of go through sort of this process. To have grandparents on one side of their mouth express that she's in the favorite grandchild posture, and on the other to have pictures of the very man that was unanimously convicted and upheld on appeal of sexually abusing her in at least one count, that those are all on the wall.

"To have a mother *** who's so outraged at her process of *** disclosing to her and irritated, but doesn't even stop to think about the very substance of what [the victim] is trying to communicate. To have a brother now, from what I've heard, even more vindictive than he appeared on the stand. I don't know what [defendant's] hold is on this family that would cause these folks to utterly abandon her. ***.

"But it's clear she's alone and has been alone since she was ten. Well, even before that. Since she was five, since

---

[3] Specifically, on Counts 1, 2, 3, 4, 5, 8, and 9, the court imposed a 300-month term of incarceration. On Counts 6, 7, 10, 11, 13, and 14, the court imposed a 75-month term of incarceration. But the court imposed the term of incarceration on Count 6 consecutive to the term of incarceration on Count 1.

this started. That's the damage [defendant] wreaks. I've seen these cases over 25 years of dealing with these types of cases and I've seen victims that * * * these events in their lives are mere speed bumps in their lives and they overcome them, and they have support systems. I've seen families pitted against each other where there's been rifts in the families and splits.

"I can't remember a case where I've seen a victim so utterly left alone. That's the damage that was wrought. You know, absolutely correct, everybody has a right to a trial. I don't have any issue over that and I don't look at sentencing based upon that, but it's what happens during the trial is significant. Because this was not a trial, [defendant], in which you chose to argue the State can't prove their case or that the evidence will be insufficient to prove beyond a reasonable doubt. You started your case by calling [the victim] a liar.

"Nope. Do not shake your head at me, sir. Do not shake your head at me. You are responsible for the defense that you had and you started this defense by calling her a liar. By saying you had never touched her to this jury and that just simply was not true. As I mentioned, the jury unanimously convicted you of touching her, of abusing her. She was not a liar. That was an incorrect place to be, but that's how you chose then to address this trial.

"Thirty-five out of 36 jurors that have looked at these counts have found you guilty of it. No, I guess, that's maybe a little off, because a couple of them were 10-2's. So, at least 34 out of 36 jurors have found you guilty of all these counts. [4] But, more importantly, this jury looking at it and making sure they were unanimous, found you guilty. That's the damage that—that you have—that you've chosen to wreak on—on this victim who I now find is in a much worse place than most victims I've ever seen. I mean, that was the hard question when [the prosecutor] asked her, 'So, who do you have supporting you?' Aside from—aside from her eight-month-old child, nobody.

"I balance that against the time that you have in front of you, except its devastation that is difficult really to quantify. Based upon that, I am choosing to run 300 months consecutive to what you have in Count 6, based upon the fact that you chose a tactic that was deliberately designed to cause incredible difficulties for this victim. Not that just

[4] We understand the trial court to have meant 22 out of 24 jurors.

the State would not be able to prove it, that's—that's a different tactic. This was a different, different way of going about it."

Defendant appeals the resulting judgment of conviction.

## II.   ANALYSIS

### A.   *Request for Substitute Counsel*

In his first assignment of error, defendant contends that "the trial court erred when it denied his request for a new attorney." As explained below, we conclude that the trial court did not err in denying defendant's motion for substitute counsel.

Specifically, on appeal, defendant contends that the trial court erred because it was required to provide defendant (as opposed to defendant's counsel) "an opportunity to explain the reasons for requesting substitute counsel"; that is, in defendant's view, the trial court was required to "ask defendant why he wanted substitute counsel." Defendant argues that the trial court's failure to do so constitutes an abuse of discretion.

In advancing his argument on appeal, defendant does not develop any argument as to how, on the particular record before the trial court, it constituted an abuse of discretion for the trial court to deny defendant's motion without asking defendant personally why he wanted substitute counsel: That is, defendant does not argue, for example, that, in view of defense counsel's statements to the trial court about defendant's "qualms" with MPD, the trial court was obligated to make further inquiry of defendant personally and make more fulsome record in order to avoid abusing its discretion.

Instead, we understand defendant to argue that, as a matter of law, it is always an abuse of discretion for a trial court to deny a motion for substitute counsel absent the trial court asking the defendant personally (as opposed to through counsel) why they are seeking substitute counsel.

The state responds that the trial court did not abuse its discretion because "the court did not have an affirmative duty to conduct an inquiry into defendant's complaints,"

and that, "when faced with a motion for substitute counsel, trial courts have the discretion to determine the scope of the inquiry necessary to decide the motion."

   1.   *Legal Framework*

        "State and federal constitutional provisions guarantee a defendant in a criminal case the right to the assistance of counsel."[5] *State v. Smith*, 339 Or 515, 526, 123 P3d 261 (2005). When a defendant is indigent, such as defendant in this case, "the right to counsel includes the right to court-appointed counsel." *State v. Stanton*, 369 Or 707, 715, 511 P3d 1 (2022). "But an indigent defendant does not have the right to court-appointed counsel of the defendant's own choosing." *Id.* (internal quotation marks omitted). Consequently, a trial court is not required to appoint a substitute lawyer for a defendant "in the absence of a legitimate complaint concerning the one already appointed for him." *Id.* (internal quotation marks omitted). A "legitimate complaint" is a complaint "based on an abridgement of [his] constitutional right to counsel." *Id.* at 718.

        We have stated that "[a] trial court faced with a motion to substitute indigent counsel *should engage* in an inquiry into the legitimacy of any complaint about appointed counsel." *State v. Daley*, 318 Or App 211, 213, 506 P3d 502, *rev den*, 370 Or 212 (2022) (emphasis added; internal quotation marks omitted). However, "[s]uch an inquiry is, necessarily, case—and fact—specific." *Id.* The trial court "possesses discretion to determine the scope of the inquiry necessitated by a particular complaint," and "the trial court's ruling on a motion to substitute counsel is reviewed for abuse of discretion." *Id.* (internal quotation marks omitted).

        In considering how those principles apply in this case, the Supreme Court's decision in *Smith*—wherein the court considered "the scope of a trial court's obligation when a defendant requests that the court appoint new

---

[5] Specifically, Article I, section 11, of the Oregon Constitution provides that "[i]n all criminal prosecutions, the accused shall have the right to *** be heard by himself and counsel."

The Sixth Amendment to the United States Constitution provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right *** to have the Assistance of Counsel for his defence."

counsel because the defendant is dissatisfied with his existing appointed counsel"—is instructive. 339 Or at 517.

In *Smith*, the defendant requested that the trial court appoint substitute counsel because the defendant asserted that "he lacked confidence in his counsel and his counsel had failed to investigate his case adequately." *Id.* Specifically, in the trial at issue in *Smith*, defense counsel explained that the defendant believed that he was "not prepared and ready to go" and had "some problems with the way [counsel had] been handling [the case] with [the defendant] over the past few days," and then told the court that he would "let [the defendant] indicate to the court what his concerns are and have the court address that with him." *Id.* The trial court then gave the defendant an opportunity to address the court regarding the request for substitute counsel; the defendant described his concerns with defense counsel; and the trial court denied the motion for substitute counsel, expressing "confidence that defendant's appointed counsel was competent and was prepared for trial." *Id.* at 517-18. The defendant was ultimately convicted, and he appealed, asserting that the trial court erred in "failing to inquire into defendant's claims regarding the adequacy of his counsel." *Id.* at 519.

This court remanded to the trial court "to conduct a hearing on defendant's complaints about his counsel and to determine whether defendant's counsel had been adequate." *Id.* at 520. We did so because we determined that "the trial court had an affirmative duty to inquire into defendant's request for a new attorney but had failed to make that inquiry" and, therefore, we "did not have an adequate record on which to affirm the trial court's judgment." *Id.* at 520-21 (internal quotation marks omitted).

The Supreme Court then reversed our decision. It explained that "in ruling on a motion for appointment of new counsel," the trial court's obligation is to "engag[e] in such inquiry as the nature of defendant's complaints requires," and that its case law had not established "a rule of law that a trial court has an affirmative duty to conduct an inquiry and make a factual assessment in response to a defendant's complaints about appointed counsel." *See id.* at 525, 530. Indeed, the court

noted that one commentator—Judge William W. Schwarzer—argued "that a trial court confronted with a complaint about the adequacy of counsel should conduct an inquiry and make findings on whether bona fide grounds exist for a change of counsel."[6] *Id.* at 529 n 6. But it stated that, although "such an inquiry may be appropriate in some circumstances," "the constitutional right to adequate counsel does not impose such an affirmative obligation on the trial court." *Id.* The court further explained that, in evaluating whether a trial court abused its discretion in denying a motion for substitute counsel, "the appellate court should focus on whether the trial court abused its discretion in ruling on the motion to substitute counsel based on the record the court had before it." *Id.*

In reaching its conclusion that the trial court does not have an affirmative duty to inquire, the court reasoned that "in many cases, the disadvantages of a factual inquiry into a defendant's complaints about counsel during trial will be substantial." *Id.* at 529. That is because such an inquiry may "raise serious issues about the disclosure of privileged communications, lawyer work product, and trial strategy." *Id.* And, in contrast, "post-conviction trial procedures ordinarily will be superior to a truncated factual inquiry during a criminal trial as a way to determine whether defense counsel was inadequate." *Id.* That is, Oregon's system for post-conviction relief provides "a constitutionally sufficient mechanism for a person convicted of a crime to raise any claim of inadequate counsel and to obtain appropriate relief." *Id.*

Finally, the Supreme Court in *Smith* noted that there may be "rare" circumstances that are "so egregious as to require the court's immediate attention." *Id.* at 527 n 4. Where, for example, "the trial court knows or reasonably should know from the record before it that appointed counsel may have a conflict of interest, the trial court is obligated to inquire about that potential conflict." *Id.* Also the court may be obligated to inquire when "counsel's conduct at trial in the presence of the judge, the full details of which are established on the trial record, raises serious doubts about whether counsel is adequate." *Id.*

---

[6] Judge Schwarzer made that argument in his article *Dealing with Incompetent Counsel—The Trial Judge's Role*, 93 Harv L Rev 633 (1980).

2. *Application*

The Supreme Court's opinion in *Smith* is not on all fours with this case: In *Smith*, the defendant himself explained his concerns to the court, after his counsel suggested that the court have him do so. Here, defendant did not personally explain his concerns to the court, and defendant's counsel did not suggest that defendant himself be invited to do so.

But the reasoning in *Smith* leads us to reject what we understand to be defendant's proposed rule, *i.e.*, that a trial court *always* abuses its discretion when a defendant's appointed counsel seeks to withdraw at the defendant's request, the defendant seeks substitute appointed counsel, and the trial court fails to ask the defendant personally (as opposed to defendant's counsel) about the defendant's complaints. As noted, in *Smith*, the Supreme Court recognized that its case law up until that point did not establish "a rule of law that a trial court has an affirmative duty to conduct an inquiry and make a factual assessment in response to a defendant's complaints about appointed counsel," *see* 339 Or at 525, and we do not understand the Supreme Court's case law after *Smith* to have established such a rule of law. That is, the Supreme Court's conclusion that "the constitutional right to adequate counsel does not impose such an affirmative obligation on the trial court," *i.e.*, an obligation to conduct an inquiry and make a factual assessment in response to a defendant's complaint, *id.* at 529 n 6, remains true.

It also remains true that, as the court in *Smith* recognized, there can be "disadvantages of a factual inquiry into a defendant's complaints" about defense counsel, and Oregon's system for post-conviction relief "ordinarily will be superior to a truncated factual inquiry during a criminal trial as a way to determine whether defense counsel was inadequate," *i.e.*, whether a defendant's complaint constituted a "legitimate complaint." *Id.* at 529-30.

In sum, we conclude that a trial court does not *always* abuse its discretion when it does not inquire of a defendant personally when a defendant seeks substitute counsel. But we do not foreclose that they may be some circumstances

where a trial court is required to make inquiry of a defendant personally to avoid abusing its discretion—where, for example, a defendant's complaint is based on a conflict of interest. *See id.* at 527 n 4. Additionally, where a defendant themselves *affirmatively* seeks "to demonstrate to the court that counsel is not providing adequate representation, the court must consider, not reject, the facts proffered by the defendant." *State v. Langley*, 351 Or 652, 672 n 14, 273 P3d 901 (2012).

But, in our view, this is not such a case. In this case, defendant's counsel described to the trial court the nature of defendant's complaints—qualms with the representation provided by MPD—and indicated that that was "as much as [he was] permitted to provide the court." Defendant's counsel in this case, unlike the counsel in *Smith*, did not suggest that the court inquire of defendant personally. *Cf.* 339 Or at 518. Nor, despite speaking to the court, did defendant articulate his concerns about counsel or indicate that his counsel's summary of his concerns was inaccurate.

Thus, on the record before it, we cannot say that the trial court abused its discretion in determining that the "particular complaint" did not necessitate it to engage in an inquiry of defendant personally.

In seeking a different result, defendant relies on our decision in *State v. Omar*, 321 Or App 403, 516 P3d 747 (2022) (*Omar III*), where we noted that, in *State v. Omar*, 303 Or App 448, 450, 464 P3d 501 (2020) (*Omar I*), *vac'd in part and rem'd*, 369 Or 675, 508 P3d 501 (2022) (*Omar II*), we accepted a state concession that "the court erred when it failed to conduct an adequate inquiry into defendant's complaints about his lawyer." *Omar III*, 303 Or App at 404. But the circumstances in the trial court in *Omar* were meaningfully different than what transpired in the trial court in this case: In *Omar*, the trial court "did not actually consider or rule on defendant's motion for substitute counsel." *Omar I*, 303 Or App at 452 n 3 (noting that the trial court's failure to consider or rule on defendant's motion for substitute counsel distinguished *Omar* from the Supreme Court's decision in *Smith*). Here, the trial court both considered and ruled on the motion for substitute counsel.

Defendant also relies on the Supreme Court's decision in *Langley*. In *Langley* the defendant "sought to submit an affidavit under seal to the court explaining his position" on his counsel's motion to withdraw, but the court declined to consider it, and, further, the court "assumed that defendant was engaging in misconduct and manipulation without considering defendant's side of his dispute regarding his legal representation." 351 Or at 667-72. In that factual context, the court in *Langley* stated that "when a defendant seeks to demonstrate to the court that counsel is not providing adequate representation, the court must consider, not reject, the facts proffered by the defendant, as well as other relevant evidence in the entire record, before deciding whether the defendant's complaints have any merit and, even if they do not, whether the defendant's behavior as a separate matter constitutes misconduct." *Id.* at 672 n 14. But *Langley* does not help defendant because, unlike the defendant in *Langley*, defendant did not affirmatively seek to "demonstrate to the court that counsel is not providing adequate representation." *Id.* That is, unlike *Langley*, this is not a case in which a defendant personally sought to affirmatively present information regarding concerns with counsel to the trial court, and then the trial court failed to consider that information.

We thus conclude that the trial court did not abuse its discretion.

B.   *Imposition of Greater Sentence on Remand.*

In his third assignment of error, defendant contends that the trial court erred "when it imposed a sentence on remand greater than the sentence imposed originally." Specifically, defendant contends that his sentence on remand violated the Due Process Clause of the Fourteenth Amendment to the United State Constitution,[7] because that clause "requires that vindictiveness against a defendant for having successfully attacked his first conviction must play no part in the sentence he receives after a new trial following a successful appeal." (Internal quotation marks omitted.) In defendant's view, the trial court's imposition of a more severe sentence on remand is "presumed to be based on vindictive

---

[7] The Due Process Clause provides, "nor shall any State deprive any person of life, liberty, or property, without due process of law."

motives," and he also argues that "the trial court's basis for imposing a greater sentence"—which defendant characterizes as "a trial strategy developed by his attorney"—"does not overcome the presumption of vindictiveness."

In response, the state acknowledges that "due process mandates that 'vindictiveness' for pursuing [an] appeal can play no part in the sentence [a defendant] receives after a new trial." (Some internal quotation marks omitted.) It contends, however, that where, as here, a "different court imposes an increased sentence on remand following an appeal, the presumption of vindictiveness is inapplicable." Further, in the state's view, because the trial court articulated a "wholly logical, nonvindictive reason" for the increased sentence—which the state characterizes as the "'devastation' that the victim suffered because of defendant's conduct"—defendant's increased sentence "comported with due process and was lawful."

    1.  *Legal Framework*

We review a claim that the sentencing court failed to comply with the requirements of law in imposing a sentence for errors of law. *State v. Bradley*, 281 Or App 696, 700, 383 P3d 937 (2016), *rev den*, 361 Or 645 (2017). As defendant asserts, "the Due Process Clause of the Fourteenth Amendment to the United States Constitution protects a criminal defendant's right to appeal, such that he may not receive a vindictive sentence on remand for successfully pursuing an appeal." *State v. Reinke*, 289 Or App 10, 15, 408 P3d 249 (2017), *rev den*, 362 Or 665 (2018).

In *Reinke*, we explained that we utilize a "two-step inquiry" to "determine whether a judge who was not the original sentencing judge has imposed a sentence on remand that triggers a presumption of vindictiveness, which, if triggered, makes the sentence unlawful." *Id.* "The first step requires the appellate court to determine whether the resentencing court has imposed a sentence that is more severe than was originally imposed, which turns on whether the total length of the second sentence exceeds that of the first." *Id.* at 15-16 (internal quotation marks omitted). The second step requires the court to determine "whether the

resentencing court has articulated a wholly logical, nonvindictive reason for the more severe sentence." *Id.* And, "[i]f the resentencing court has done that, then the second sentence is not presumed to be vindictive and, thus, the defendant's due process rights have not been violated by the imposition of a more severe sentence on remand." *Id.*

Determining whether a trial court's articulated reason for imposing a more severe sentence is a "wholly logical, nonvindictive reason" requires understanding what "vindictive" means.

In *State v. Febuary*, the Supreme Court considered that question in the context of resentencing after remand and noted that, under United States Supreme Court case law, "the core due process concern is to avoid 'penalizing' defendants who chose to exercise their right to appeal." 361 Or 544, 555-56, 396 P3d 894 (2017) (quoting *North Carolina v. Pearce*, 395 US 711, 723, 89 S Ct 2072, 23 L Ed 2d 656 (1969)). The court went on to explain that the "touchstone for vindictiveness in sentencing" is the presence of an "improper motive," such as "punishing a defendant for his having succeeded in getting his original conviction set aside, enforcing the institutional bias inherent in the judicial system against the retrial of issues that have already been decided, engaging in self-vindication, or discouraging meritless appeals." *Id.* (internal quotation marks, brackets, and citation omitted).[8]

---

[8] We note that, at least on the surface, there may be some tension between the test for assessing when a more severe sentence violates due process as it is articulated in *Reinke* and the test as articulated by the Supreme Court in *Febuary*.

*Reinke* observed, for example, that the "phrase presumption of vindictiveness is confusing," because "[u]nlike traditional presumptions in the law that are susceptible to being rebutted, once a presumption of vindictiveness is established, it is not rebuttable." 289 Or App at 15 n 8 (internal quotation marks omitted). But in *Febuary*, the Supreme Court stated that, once a presumption of vindictiveness is established the state may "'rebut the presumption that an increased sentence *** resulted from vindictiveness.'" 361 Or at 557 (quoting *Wasman v. United States*, 468 US 559, 569, 104 S Ct 3217, 82 L Ed 2d 424 (1984)).

Similarly, in *Reinke*, we appeared to conclude that if the presumption of vindictiveness did not apply, then the defendant's due process right were not violated. *Reinke*, 289 Or App at 15 (stating that where the resentencing court articulates a wholly logical, nonvindictive reason for the more severe sentence "the second sentence is not presumed to be vindictive and, thus, the defendant's due process rights have not been violated by the imposition of a more severe sentence

But the United States Constitution also prohibits "penaliz[ing] a defendant for his assertion of protected Sixth Amendment rights, including the right to go to trial." *United States v. Valdez-Lopez*, 4 F4th 886, 893 (9th Cir 2021) (internal quotation marks omitted); *see also United States v. Hernandez*, 894 F3d 1104, 1109 (9th Cir 2018) (noting "the Supreme Court has repeatedly emphasized that to punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort"). That is, a "sentence is unconstitutionally vindictive if it imposes greater punishment because the defendant exercised a constitutional right, such as * * * the right to a jury trial." *Waring v. Delo*, 7 F3d 753, 758 (8th Cir 1993). Nevertheless, it is permissible, at least in some circumstances, for a sentencing judge to take into account what transpires during a defendant's trial in determining the sentence to impose, because "the defendant's conduct during trial may give the judge insights into his moral character and suitability for rehabilitation." *Alabama v. Smith*, 490 US 794, 801, 109 S Ct 2201, 104 L Ed 2d 865 (1989).

In considering those principles as relevant to this case, our decision in *State v. Qualey*, 138 Or App 74, 906 P2d 835 (1995), is helpful. During sentencing after a trial in that case, the trial court "openly expressed displeasure with defendant's decision to take the case to trial," expressing its view that defendant had "traumatized [the victim] twice[,] [o]nce * * * on the day of the incident, and the second [when] putting him through this court hearing"—*i.e.*, the trial. *Id.* at 76 (first alteration in original). The court then opined that although the defendant was "entitled to exercise his rights"—*i.e.*, the right to a trial—he "is not insulated

---

on remand"). But, in *Febuary*, the court stated that "[i]f a defendant is unable to establish the presumption of improper motive, the defendant *always may show* a due process violation by affirmatively proving actual vindictiveness, with proof that an improper motive caused the more severe subsequent sentence, such as statements by the judge demonstrating actual vindictiveness." 361 Or at 558 (internal quotation marks, brackets, and citation omitted; emphasis added).

At least for purposes of our analysis in this case, however, that perceived tension need not be resolved. As explained, we conclude that the trial court's statements disapproving of defendant's trial "tactic" suggests that it was impermissibly punishing defendant for exercising a right guaranteed by the Sixth Amendment to the United States Constitution: specifically, his constitutional right to present a defense. That is error under either *Reinke* or *Febuary*.

from the consequences of doing that when it harms other people and there are viable alternatives," such as pleading guilty. *Id.* at 77.

On appeal in *Qualey*, the defendant claimed that the trial court "punished him for exercising his constitutional right to a jury trial." *Id.* at 76. We remanded for resentencing because "[t]he court's statements lead to the inference that defendant's sentence, or part thereof, was based on defendant's decision to reject the prosecutor's plea bargain and proceed to trial." *Id.* at 77. We explained that a "court must impose a sentence based solely on the facts of the case and the defendant's personal history, and not as punishment for pleading not guilty and proceeding to trial." *Id.* at 76; *see also State v. Smith*, 52 Or App 681, 684, 629 P2d 420 (1981) (error for trial court to base its sentence "on the fact that the court reserved favored treatment for people who own up to their misdeeds, *i.e.*, plead guilty" because "such a policy does punish a defendant who exercises his right to stand trial").

### 2. *Application*

Applying the two-step inquiry set forth in *Reinke* here, we conclude that defendant's sentence on remand did violate his due process rights.

As to the first step—whether the sentence imposed was more severe than the sentence originally imposed— defendant's sentence on remand is more severe than the sentence that he initially received: He received 300 months' incarceration after his first trial and 375 months' incarceration after his second trial. *Reinke*, 289 Or App at 10 (first part of test in *Reinke* satisfied where "[t]he total length of [the] sentence on remand is longer than the length of [the] initial sentence").

As to the second step, we conclude that the trial court did not articulate a "wholly logical, nonvindictive reason for the more severe sentence." *Id.*

As described above, the trial court explained that its sentence was partially based on the harm that defendant had caused to this particular victim—the trial court noted that it could not "remember a case where I've seen a victim

so utterly left alone." We see no error in that aspect of the trial court's sentencing decision. The degree of harm to the victim is both a routine and constitutionally permissible consideration when determining what sentence to impose on a defendant. *See* OAR 213-008-0002(1)(b) (in determining whether a substantial and compelling reason for a departure sentence exists, a sentencing court may consider (1) whether the "degree of harm or loss attributed to the current crime of conviction was significantly greater than typical for such an offense" and (2) whether "the offense resulted in a permanent injury to the victim"); *see also Smith*, 490 US at 801 (a sentence given after trial may be lengthier than a sentence imposed after pleading guilty because "[i]n the course of the proof at trial the judge may gather a fuller appreciation of the nature and extent of the crimes charged"). Additionally, we note that the duration of one aspect of the harm to the victim in this case resulting from defendant's crimes—namely, the victim's prolonged isolation from her family—would not necessarily have been foreshadowed to the first sentencing judge in the manner it was starkly demonstrated to the second sentencing judge.

But, as defendant notes, in sentencing defendant, the trial court also considered statements made by defense counsel during defendant's second trial, *i.e.*, defense counsel's comment during his opening statement that the victim was a "liar" and that defendant "never touched her." The trial court also expressed its view that that was a "tactic that was deliberately designed to cause incredible difficulties for this victim." Defendant contends that that "is not a basis to impose an additional 75 months of imprisonment" because "if it was a basis for imposing an increased term of imprisonment, it would have a chilling effect on the zealous advocacy of defense counsel."

The trial court's statement in this case disapproving of defendant's trial "tactic" and using that as a basis to impose a consecutive sentence suggests that it was impermissibly punishing defendant for exercising a right guaranteed by the Sixth Amendment to the United States Constitution: specifically, his constitutional right to present a defense. *Faretta v. California*, 422 US 806, 818, 95 S Ct 2525, 45 L Ed

2d 562 (1975) (noting that the Sixth Amendment "constitutionalizes the right in an adversary criminal trial to make a defense as we know it"). That right guarantees a criminal defendant the "right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies." *Washington v. Texas*, 388 US 14, 19, 87 S Ct 1920, 1923, 18 L Ed 2d 1019 (1967) (so noting in the context of a defendant's right to offer the testimony of witnesses and to compel their attendance).

Just as the trial court in *Qualey* remarked that defendant was "entitled to exercise his rights," but he was not "insulated from the consequences of doing that when it harms other people and there are viable alternatives," 138 Or App at 77, the trial court here remarked that "everybody has a right to a trial" but observed that defendant "started [his] case by calling [the victim] a liar" rather than choosing a different defense—*i.e.*, arguing that "the State can't prove their case or that the evidence will be insufficient to prove [guilt] beyond a reasonable doubt." That was not a "wholly logical, nonvindictive reason for the more severe sentence." As noted, instead, it suggests that the trial court was impermissibly punishing defendant for exercising his right to present a defense.[9] Thus, remand for resentencing is required.[10]

---

[9] In reaching our conclusion, we are mindful that "[t]he right to present a defense, while fundamental, is not absolute" and at times it must "bow to accommodate legitimate, competing interests in the criminal trial process." *United States v. Oldman*, 979 F3d 1234, 1252 (10th Cir 2020).

For that reason, we emphasize that our analysis with regard to defendant's third assignment of error related to vindictiveness during sentencing is premised on consideration of the reasons the trial court articulated during defendant's sentencing for imposing the term of incarceration that it did impose. Our analysis does not concern other aspects of a criminal trial that might implicate a defendant's right to present a defense, *e.g.*, how a trial court may exercise its discretion in controlling counsels' argument during trial. *See State v. Logston*, 270 Or App 296, 303, 347 P3d 352 (2015) (recognizing that "control of counsels' arguments is within the discretion of the trial court").

[10] In his briefing in support of his third assignment of error, defendant does not expressly argue that the trial ***court*** vindictively sentenced him for exercising his right to trial or right to present a defense. And we are mindful that "[i]t is not this court's function to speculate as to what a party's argument might be" or "to make or develop a party's argument when that party has not endeavored to do so itself." *Beall Transport Equipment Co. v. Southern Pacific*, 186 Or App 696, 700 n 2, 64 P3d 1193, *adh'd to as clarified on recons*, 187 Or App 472, 68 P3d 259 (2003).

Remanded for resentencing; otherwise affirmed.

Nevertheless, having considered the parties' arguments, we think defendant's argument that the trial court's consideration of his "trial strategy" was not a "wholly logical, non-vindictive" reason for the increased sentence that he received on remand, at least broadly understood, adequately presents for our consideration whether the trial court vindictively sentenced defendant for exercising his constitutionally protected right to present a defense.